LANDRY, Judge.
From a judgment of the trial court rejecting the demand of Southwest Fabricating and Welding Company, Inc. (Southwest), for damages aggregating $77,375.20, against defendant, Roy L. Jones, Incorporated (Jones) for alleged breach of contract to haul, transport and deliver certain units of fabricated refinery equipment, plaintiff has appealed.
For most part, the basic facts of the present controversy are not in dispute except as will hereinafter otherwise appear.
The Shell Oil Company proposed construction of an oil refinery in North Terre-bonne Parish near Houma, Louisiana, and engaged Hudson Engineering Corporation, (Hudson), as the prime contractor for the project. In turn, Hudson requested plaintiff, through plaintiff’s Baton Rouge, Louisiana Division known as Delta Southern Company (Delta) to submit a bid for construction and delivery to the plant site of 18 items of fabricated equipment, (known in the trade and hereinafter referred to as “vessels”), designed as components for the proposed refinery, said units varying in weight from 20,000 to 560,000 pounds. To provide delivery of the various units in the event it should obtain contracts for their manufacture, plaintiff invited quotations from defendant, Roy L. Jones, Incorporated (Jones) for transporting the completed vessels from Delta to the refinery site in Terrebonne Parish.
By letter dated June 27, 1963, defendant submitted an itemized drayage cost for each of the 18 vessels aggregating the sum of $35,208.25. On the following day, June 28, 1963, defendant wrote plaintiff asking that plaintiff remit purchase orders to defendant confirming defendant’s quotations for service promptly upon plaintiff securing firm orders for the Shell Refinery job or any other project and commencing placement of orders for the materials required.
It developed that plaintiff proved to be the successful bidder on only 10 of the 18 vessels for the Shell Refinery on which defendant submitted transportation charges. On July 1, 1963, plaintiff received a tentative purchase order from Hudson which order was subsequently validated and made firm by instrument dated September 16, 1963, and received by plaintiff September 27, 1963.
As will hereinafter appear, whether or not defendant was duly notified of the confirmation of September 27, 1963, is a matter of considerable importance and one of the few paramount issues in dispute 'n this law suit.
It is undisputed, however, that on February 21, 1964, plaintiff issued to defendant a purchase order covering 9 of the 10 vessels for which plaintiff proved to be the successful bidder and upon which defendant had submitted a quotation. It is likewise uncon-troverted that the vessel eliminated was the smallest on the list and for which defendant had indicated the transportation charge would be $236.00.
Plaintiff’s purchase order of February 21, 1964 was returned by defendant accompanied by a letter dated March 18, 1964, advising that defendant had withdrawn its former offer. In the meanwhile, on March 2, 1964, defendant informed plaintiff by wire that defendant was unable to obtain permits necessary to transport the vessels over the highways of the state. Six days later, on March 8, 1964, defendant notified plaintiff that defendant was in the process of investigating certain conditions at the destination point which might affect delivery.
Through counsel, plaintiff on April 3, 1964, called upon defendant to perform, failing which plaintiff would hold defendant responsible for any monetary loss occasioned by defendant’s refusal. On April 8, 1964, defendant’s counsel informed plaintiff that in his view no contractual relation *531 ship existed between the parties and defendant would not undertake to haul the vessels in question.
Thereafter plaintiff arranged for transportation of the vessels by another carrier at a total cost of $120,672.48, and instituted this action for the amount herein sought, said sum being the difference between the total cost incurred and the alleged contract price, allowing defendant credit for $7,-398.48, for which defendant admittedly is not liable, which allowance plaintiff now concedes should be $12,266.95.
The record shows that some of the vessels involved were of such unusual weight and dimensions that permits for their transportation by truck over state highways could not be obtained thus necessitating their shipment by rail and barge at considerable additional cost. It is not seriously questioned that the mode of shipment undertaken was the only practical means as well as the most economical.
In essence plaintiff maintained in the trial court and re-urges before us that defendant’s letter of June 27, 1963, quoting plaintiff prices per unit involved was tantamount to an offer which was timely accepted by plaintiff and therefore constituted a binding agreement. In this regard plaintiff argues that defendant’s offer contained no conditions inasmuch as it was not tendered on an “all or none” basis and contained no time limit for its acceptance. Appellant further argues that according to the custom of the trade it is understood such offers for hauling may ultimately result in the offerer being awarded only part of the work for which prices are submitted of which custom, defendant, as an experienced hauler, was well aware. Plaintiff also , maintains defendant was cognizant that, in such cases, it is not unusual for fabrication time to consume many weeks. On this basis it is contended there was no unusual delay between the time plaintiff received confirmation of the tentative offer from Hudson and forwarded its purchase order to defendant.
On the contrary, defendant contends its-offer of June 27, 1963, contained a condition precedent which was never met by-plaintiff, namely, that plaintiff would immediately notify defendant of confirmation, of Pludson’s order and plaintiff’s placement of orders for materials to fill same. In-this connection defendant argues such condition was an absolute necessity in order to permit sufficient time to make the numerous and complex arrangements necessary to transport vessels of the nature involved, including, but not limited to securing permits and site preparations. Regarding plaintiff’s order of February 21,. 1964, defendant maintains it amounted to a counter offer for only part of the original' vessels which counter offer defendant never accepted, gave no indication of intent to. accept and made no preparation to fulfill. Defendant also contends plaintiff’s.order of January 21, 1964, contained a new condition, namely, that defendant must provide a 600,000 pound tail-dolly, a requirement not included in plaintiff’s original proposal and never discussed by the parties.
In rejecting plaintiff’s demands, our learned colleague below found in effect that plaintiff failed to comply with the time demand contained in defendant’s letter of June 27, 1963, because notwithstanding plaintiff received confirmation from Hudson on September 16, 1963, and immediately placed orders for material to fill same, plaintiff failed to so notify defendant until February 21, 1964, on which date it sent its order for 9 vessels and added the requirement for a 600,000 pound tail-dolly. The trial court in essence concluded plaintiff’s work order of February 21, 1964, constituted an entirely new offer in that it changed the number of vessels from 18 to 9, imposed new conditions and was never accepted by defendant.
Learned counsel for appellant maintains the trial court erred in holding that plaintiff failed to timely accept defendant’s offer as contained in the letter of June 27, 1963. Alternatively, counsel maintains that if *532 plaintiffs letter of January 21, 1964, amounted to a counter offer, the trial court erred in failing to hold it was accepted by defendant.
We note that defendant’s letter of June 27, 1963, contains the following clause:
“Other correspondence related to this letter by reference will follow to further explain these quotations and others to the same job site.”
On June 27, 1963, defendant wrote plaintiff a supplemental letter relative to the proposed matter in which the following appears :
“As we told you, there is a possibility (a possibility only) that Items #1103 and #1104 (2 each) can be transported by truck from your plant to the job-site. If this can be done, total transportation costs to you would be:
Item #1103 — $5616.80 (each)
Item #1104 — $5085.80 (each)
Since this possibility is only slight, a great deal of time will be required to thoroughly and carefully check it out. We will keep you informed by copies of all correspondence.”
In still another supplemental letter dated June 28, 1963, defendant advised plaintiff as follows:
“As you know, we go to any necessary point in order to research and properly estimate costs in movement of your oversize loads. We realize that, often enough, you are not the successful bidder. But in those cases in which you are successful, we, who feel that we played some part in your success, must wait until practically the last day before we know for sure, that we will be hired to perform the service we originally researched. We ask you to reflect on our position of suspense during the time you are manufacturing the vessels, and suggest that you take us off this hook of suspension..
After you have received your firm Purchase Order from your customer and begin placing your Purchase Orders for materials, services, etc., we ask you to confirm our service and cost with your Purchase Order to us so that we can go about our business of preparedness. This, of course, refers to your volume and/or oversize loads that you intend for us to handle, whether to Shell Oil or any other job.” (Emphasis by the court.)
To constitute a binding contract between parties there must be a mutuality of consent, or, as otherwise expressed a meeting of the minds. LSA-C.C. Article 1798. No contract can arise from negotiations between parties unless both have agreed to its terms and conditions. Allison v. Pick, 229 La. 524, 86 So.2d 179; Faroldi v. Nungesser, La.App., 144 So.2d 568.
Plaintiff produced as a witness its Assistant Manager, John Plarris, who testified that at the time negotiations were commenced with defendant, plaintiff was represented by its General Manager, Tom Ward, who was no longer in plaintiff’s employ. According to Harris, Ward left Delta in September, 1963, and was succeeded by Kettner who in turn was followed by a Mr. Galus and N. H. Moerke, Delta’s present General Manager.
In substance Iiarris testified it was customary in the trade to obtain bids from haulers when requested by concerns such as Hudson to quote prices for refinery vessels because the prime contractor desired a price which reflected delivery of the finished vessel “alongside foundation” which, from the record we understand to mean that portion of the owner’s premises where the equipment is to be actually installed. He testified further that it was also customary that drayage prices be obtained in advance and defendant understood that its quotations to plaintiff though made in June, 1963, would hold during the period required to construct the respective vessels. Harris acknowledged that he did not *533 personally inform defendant when plaintiff commenced placement of orders for materials with which to fabricate the vessels in question. Of his own knowledge he was unable to state whether any other representative of plaintiff had so informed defendant although he understood such notice had been given.
Defendant’s representative, Earle Alford, testified that it is the usual practice to quote transportation charges in advance and concerns such as his frequently do so knowing they may not be awarded the contract. He testified without equivocation that no notice whatsoever was forthcoming from plaintiff as requested in defendánt’s letter of June 28, 1963. According to Alford the first notice received by defendant was plaintiff’s letter of February 21, 1964, calling upon defendant to transport 9 vessels instead of 18 and containing the requirement that a 600,000 pound tail-dolly be provided. Alford also testified that on several occasions he verbally requested a purchase order from plaintiff without avail. By the end of 1963, he was convinced defendant would not be awarded the work and ceased all preparations. Alford explained his telegrams of March 2, and March 8, 1964, to plaintiff relative to his inability to obtain permits and his continuing investigation of conditions at the plant site as a means of getting plaintiff “off my back.” He stated positively that when the wires were sent his concern had no intention of performing as plaintiff had failed to place a firm purchase order as initially requested in June, 1963.
Defendant offered the testimony of a disinterested witness, Edward E. Darnielle, Hudson’s General Construction Superintendent. Darnielle testified his duties consisted of performing the preliminary construction plans for the refinery which embraced construction schedule and methods, but not design. One of his principal duties as construction superintendent was to coordinate the sequence of arrival and movement of the vessels at the plant site. This, he explained, dealt primarily with the order of installation which in turn was affected by sequence in delivery. He also explained that the 600,000 pound tail-dolly mentioned in plaintiff’s letter of February 21, 1964, was made a requirement solely to accommodate Hudson in that it would enable movement of the vessels at the plant site in conformity with the planned construction schedule. Darnielle gave the significant testimony that because of Hudson’s interest in delivery schedule, which had to be coordinated with programmed construction, his firm was vitally interested in learning who would transport the vessels and what equipment the hauler might have available for moving the vessels about at the construction site for installation in the sequence desired. With this thought in mind, he and other representatives of Hudson inquired of plaintiff’s Mr. Kettner on November 12, 1963, who the hauler would be and was informed by Kettner that plaintiff contemplated numerous changes therefore a trucker could not be chosen at that time. Darnielle also stated that again on February 12, 1964, he inquired of plaintiff’s Mr. Galus who the hauler would be and was told that Galus still did not know who would do the hauling. Darnielle’s testimony in this vital regard is unrefuted in the record. Neither Kettner nor Galus were called to testify on plaintiff’s behalf. The record, however, discloses that neither were in the employ of plaintiff at the time of trial.
In view of the foregoing analysis of the evidence adduced herein, we are of the opinion that a contract between the litigants at bar never came into being for the reason there was no meeting of their minds on the vital issue of whether defendant would be awarded the contract and if so, what vessels defendant would be engaged to transport and the equipment defendant might be required to furnish.
The evidence preponderates in favor of the conclusion that plaintiff never notified defendant of the commencement of placement of its orders for materials as requested in defendant’s letter of June 28, *534 1963. While defendant did nevertheless proceed with certain preliminary preparations in the event it might ultimately be awarded the contract, it appears defendant was never certain it would get the work. It is also clear, we believe, that as shown by the unrefuted testimony of Darnielle, as late as February 12, 1964, plaintiff itself was not sure the work would be awarded to defendant. When plaintiff ultimately elected to confirm its purchase order with defendant as initially requested by defendant, defendant had then withdrawn its conditional offer. Moreover, if plaintiff’s letter of February 21, 1964, be deemed a firm offer, it included conditions not originally contemplated, namely, the furnishing of the 600,000 pound tail-dolly which was made a requirement by Hudson to suit its convenience, a matter neither contemplated nor discussed in any of the negotiations between plaintiff and defendant.
In addition it appears that according to plaintiff’s letter of June 27, 1963, no meeting of the minds ever occurred with respect to the costs for hauling Items #1103 and #1104. Plaintiff’s said letter clearly indicated the quoted prices were contingent upon, the articles being transported' by truck and that at the time there appeared' little possibility that movement of these vessels could be made by highway. The letter carried the clear import that if the items had to be hauled by any means other than truck the quoted prices would not hol'd.
We attach little significance to Alford’s two telegrams postdating plaintiff’s letter of February 21, 1964. His actions in this regard, though inconsistent with defendant’s refusal to haul 9 vessels for plaintiff, takes on some degree of plausibility when viewed in the light of the total circumstances of the case.
We find that there was in fact never a meeting of the minds of the parties on the most vital aspects of the proposed contract, consequently no agreement ever came into existence.
Accordingly, the judgment of the trial! court is affirmed.
Affirmed.